UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 25-cr-231 (RCL) |
| v. : | |
| : | |
| CHRISTOPHER MURPHY, : | |
| : | |
| Defendant. : | |

**UNITED STATES' MEMORANDUM IN
SUPPORT OF PRE-TRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that Christopher Murphy (hereafter, the "Defendant") be detained pending trial, pursuant to 18 U.S.C. § 3142(f)(1)(A) (crime of violence).

On August 5, 2025, the Defendant was charged by Complaint with one count of Distribution of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1). Following his arrest in Arizona, he had his initial appearance in the United States District Court for the District of Arizona on August 11, 2025. On August 12, 2025, the Defendant was charged by indictment [ECF No. 5] with two counts of Distribution of Child Pornography and one count of Receiving Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1). On September 9, 2025, he had his initial appearance before this Court. The United States requested his detention pending trial pursuant to the above-referenced provision of the federal bail statute. The Court scheduled the Defendant's detention hearing for September 15, 2025.

Pursuant to 18 U.S.C. § 3143(e)(3)(E), there is a rebuttable presumption in favor of detention. As further detailed below, the United States respectfully submits that each of the factors weighs in favor of detention and the Defendant cannot overcome the presumption. Because the

1

Defendant poses an unmitigable risk to community safety, the United States respectfully requests that he remain detained pending trial.

   I.   **Factual and Procedural Background**

The charges stem from the Defendant's use of two encrypted messaging applications – Signal and Telegram – to distribute and to receive child sexual abuse material ("CSAM") on multiple occasions. As further detailed below, in addition to his receipt and distribution of CSAM which forms the basis for the instant charges, the Defendant was a member of several Signal groups believed by law enforcement to be used for the sharing of CSAM, hosted Zoom video meetings, or "rooms," to connect with other "pedos," and repeatedly discussed his "collection" of porn, even going so far as to describe and solicit a certain video depicting CSAM.

In July 2025, after obtaining judicial authorization to seize and search the cellular phone of a subject previously arrested in the District of Columbia (hereinafter, "SUBJECT 1"), an undercover officer ("UC") was lawfully monitoring the device. Within the phone, the UC observed direct messages on Signal between SUBJECT 1 and another Signal user ("Signal User-1")— previously known on Signal as "Chris X" and later identified as the Defendant, as detailed *infra*. Specifically, on January 25, 2025, using Signal, the Defendant asked SUBJECT 1 if there were "any perv groups rn." In response, SUBJECT 1 sent a link to a Zoom meeting. On January 29, 2025, again using Signal, the Defendant provided SUBJECT 1 with his Telegram handle. On February 2, 2025, SUBJECT 1 reached out to the Defendant on Telegram, providing his own Signal and Zoom usernames as a means of identification.

Using Telegram, the Defendant not only distributed CSAM but also engaged in multiple discussions between February 2025 and June 2025 with SUBJECT 1 regarding his collection of porn, "pedos," and joining Zoom "rooms." On February 27, 2025, for example, the Defendant

2

asked SUBJECT 1 if he was "[u]p to any misbehaving?" After accepting an invitation to join a "room" SUBJECT 1 was hosting, the Defendant said his "usual" Zoom account had been deactivated after the last time he had hosted a "room" and later thanked SUBJECT 1 for hosting a "fun room." The next day, on February 28, 2025, the Defendant told SUBJECT 1 that he was in a "small room" with "just 4 pedos." Several hours later, the Defendant told SUBJECT 1 that he was "hosting" a room and that SUBJECT 1 should join. Similarly, on March 3, 2025, the Defendant asked SUBJECT 1 if he was at work and told him that he was again running a "room." When SUBJECT 1 asked for the Defendant's Zoom screen name and told him that he was trying to "remember everyone," the Defendant sent several sexually explicit photographs, as well as a photograph of his face, which was later used to aid in his identification.

On March 4, 2025, the Defendant told SUBJECT 1 that he was "working on a porn collecting/organizing project" and asked SUBJECT 1 if he was "chatting or watching see-pee" (a reference to child pornography). After SUBJECT 1 replied "[b]oth," the Defendant asked if he could join and SUBJECT 1 sent a link to a Zoom meeting. In multiple subsequent conversations, the Defendant again discussed joining and hosting Zoom groups, as well as issues with Zoom due to the "1132 nonsense." (Of note, Zoom error code 1132 is associated with a user's temporary ban for violating community standards.)

Nor were the Telegram communications between the Defendant and SUBJECT 1 limited to sharing of Zoom rooms. Between March 22-23, 2025, the Defendant sent several videos, including two depicting CSAM, to SUBJECT 1. Specifically, on March 22, 2025, the Defendant sent a video of an adult male licking the anus of what appears to be a prepubescent boy's nude and exposed anus and scrotum. On March 23, 2025, the Defendant sent another CSAM video, which was labeled, "DAD SLAM HIS 13 YEARS OLD SON," and showed what appears to be a

3

pubescent boy being injected in the arm with an unknown substance followed by additional injections in the boy's anus before the boy's mouth and anus are penetrated by an adult male's erect penis. On April 12, 2025, the Defendant told SUBJECT 1 that despite "obsessively" trying to repair his hard drive, he ultimately lost all of his "sCPecial" content. Using Telegram, the Defendant continued to engage in similar discussions with SUBJECT 1 until June 2025, shortly before the arrest of SUBJECT 1.

Nor was the Defendant's distribution of CSAM limited to Telegram. As noted above, law enforcement identified Signal messages between the Defendant and SUBJECT 1 beginning in January 2025, including the message in which the Defendant provided his Telegram handle. Law enforcement also recovered additional Signal messages between the Defendant and SUBJECT 1, which occurred in June 2025, shortly before the arrest of SUBJECT 1. In addition to distributing and receiving CSAM, these messages make clear that the Defendant was actively soliciting certain CSAM content and attempting to "rebuild" his collection.

Specifically, on June 7, 2025, the Defendant asked SUBJECT 1 if he had a specific "reaction" video. The Defendant then provided a graphic description of the video, saying that it included a "[h]ot pedo" and a "vid of Dylan and his two dads." After SUBJECT 1 indicated that he knew which video the Defendant was referencing but did not have it, the Defendant subsequently said that he was "rebuilding" his collection and discussed methods of storing his content, as seen in Figures A-B below:



*Figure A: June 7, 2025 Signal messages between the Defendant and SUBJECT 1*



*Figure B: June 9, 2025 Signal messages between the Defendant and SUBJECT 1*

During this time frame, between June 8 and June 14, 2025, the Defendant used Signal both to distribute CSAM to SUBJECT 1, as well as to receive CSAM. Specifically, on June 8, 2025, shortly after the Defendant advised that he was rebuilding his collection, SUBJECT 1 sent fifteen videos of adult males recording themselves masturbating while watching videos on other devices of CSAM, including videos of an adult male penetrating the anus of an infant male. The Defendant acknowledged receipt by saying, "F[***], thank you!! My hero!"

6

On June 11, 2025, the Defendant sent SUBJECT 1 a CSAM video depicting an adult male's penis penetrating the anus of what appears to be a prepubescent boy, which ends with the adult male ejaculating inside of the boy's anus. On June 14, 2025, he sent SUBJECT 1 two additional CSAM videos, each comprised of numerous clips depicting adult males masturbating while watching CSAM, which included videos depicting adult males' erect penises penetrating the mouths and anuses of both infant and toddler age males.

As noted above, in March 2025, the Defendant sent SUBJECT 1 several photographs, including one that revealed his face. In July 2025, after the arrest of SUBJECT 1 and recovery of his messages with the Defendant, the UC contacted the Defendant using SUBJECT 1's Signal account, where the Defendant informed the UC that he lived in Phoenix. The UC also contacted the Defendant using a UC Telegram account, indicating that he found the Defendant through SUBJECT 1. After the UC told the Defendant that he was a "dad," the Defendant said, "[s]o you've got real experience…or at least a real shot at real experience…." The Defendant later said that he no longer shared files virtually due to the risk but did a "fair amount of screen sharing live" and talked about having had to rebuild his "special porn" collection four times.

## II.     Legal Authority

The Bail Reform Act permits a judicial officer to hold an individual without bond pending trial if the officer finds clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Pursuant to 18 U.S.C. § 3142(f)(1)(A), the judicial officer shall hold a hearing on the question of detention upon the motion of the government in a case that involves a crime of violence.

Under 18 U.S.C. § 3142(e)(3)(E), the charged offense carries a rebuttable presumption that

the Defendant presents a danger to the community and that no pretrial release condition or combination of conditions may be imposed to assure the safety of any other person and the community. This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released").

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the section 3142(g) factors. *See United States v. Ali*, 793 F. Supp. 2d 386, 388 (D.D.C. 2011). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

### III.   Analysis

Due to the charged offense, the Defendant is presumptively dangerous under Section 3142(e)(3)(E) of the Bail Reform Act. The United States respectfully submits the Defendant cannot rebut the presumption in favor of detention, and there are no conditions of release adequate to reasonably assure community safety. Therefore, this Court should detain the Defendant pending trial.

#### A.   Nature and Circumstances of the Offense Charged

The nature and circumstances of the offense weigh in favor of detention. As this Court is aware, the Defendant's conduct significantly harms our community by propagating and fueling demand for videos depicting the rape and sexual abuse of our community's most vulnerable members, young children. "Child pornography depicts pictorial evidence of physical sex abuse against and exploitation of children and the production and distribution of such contraband carries a multitude of harms." *United States v. Galarza*, No. 18-MJ-146 (RMM), 2019 WL 2028710, at *6 (D.D.C. May 8, 2019) (Howell, C.J.) (reversing release order); *United States v. Nickelson*, No. 18-MJ-102 (GMH), 2018 WL 4964506 (D.D.C. Oct. 15, 2018) (Howell, C.J.) (same); *United States v. Blanchard*, No. 18-MJ-101 (GMH), 2018 WL 4964505, at *4 (D.D.C. Oct. 15, 2018) (Howell, C.J.) (same).

This harm is concretely demonstrated by the Defendant's actions here – which involve both the distribution and receipt of child pornography. Moreover, the Defendant distributed and received CSAM under circumstances that clearly demonstrate his interest in fostering the demand for such content by connecting with others interested in the same, as well as by requesting and soliciting specific content. As noted above, his communications with SUBJECT 1 repeatedly demonstrate his willingness to join – as well as to host – Zoom "rooms" for the purpose of

connecting with other "pedos," and, notwithstanding his concerns about the risks of filesharing, his discussions with the UC indicate his willingness to "screen share live." Moreover, it is clear that the Defendant is a collector of such content – this is borne out not only by his solicitation of specific CSAM content from SUBJECT 1 but also through repeated messages about rebuilding and organizing his porn collection, as well as attempts at "improving" his methods.

Children captured in images and videos depicting their sexual abuse are significantly harmed when the images and videos are created, and their re-victimization occurs whenever an individual, such as the Defendant, views and shares these images for his own and others' sexual gratification. *See Galarza*, 2019 WL 2028710, at *6 (noting that "'the perpetual nature of child pornography distribution on the Internet causes significant additional harm to victims,' [who] 'live with persistent concern over who has seen images of their sexual abuse' and how those images are being used to cause additional harm.'" (quoting U.S. SENT'G COMM'N, FEDERAL CHILD PORNOGRAPHY OFFENSES (Dec. 2012) at vii); *Nickelson*, 2018 WL 4964506, at *4 (same); *Blanchard*, 2018 WL 4964505, at *4 (same). Indeed, the gravity of the offense is reflected in Congress's assessment that individuals charged with distributing or receiving child pornography should be presumed detained pending trial, *see* 18 U.S.C. § 3142(e)(3)(E), and upon conviction, are subject to a five-year mandatory minimum term of imprisonment and the statutory maximum sentence of up to 20 years' incarceration, *see id.* § 2252(b)(1).

### B.    The Weight of the Evidence Against Defendant

The United States respectfully submits that the strength of the evidence against the Defendant similarly weighs in favor of detention. Where, as here, "the government possesses overwhelming evidence that the defendant is guilty of the crime charged—and the nature of the charged offense involves a danger to the community—then the second factor will help meet the

10

government's burden of persuasion." *United States v. Taylor*, 289 F. Supp. 3d 55, 66 (D.D.C. 2018).

As described above, the United States is in possession of the Defendant's Signal and Telegram messages, including his distribution and receipt of multiple CSAM videos between March and June 2025. Nor can the Defendant meaningfully dispute that he operated both the Signal and Telegram accounts used to receive and distribute CSAM. First, Signal User-1, which was previously identified with username "Chris X," identified himself to SUBJECT 1 as "Chris" and told the UC that he resided in Phoenix (where the Defendant resided at the time of his arrest). He also identified his own Telegram handle, the same account that the Defendant later used in sending a picture of himself to SUBJECT 1. Moreover, in a July 14, 2025 Telegram exchange with the UC, the Defendant said he would be 36 "next week" – which corresponds to the Defendant's July birth date.

### C. The Defendant's History and Characteristics

The United States respectfully submits that the third factor concerning the Defendant's history and characteristics also weighs in favor of detention. Notwithstanding the Defendant's lack of criminal history, his interest in CSAM and desire to acquire additional content is so strong that he was driven to seek out and network with other likeminded individuals. Moreover, the Defendant's conduct is not isolated – rather, it appears to reflect a pattern of behavior over a period of months, if not longer. Indeed, the Defendant's comments about being "smarter" with respect to his collection, which he indicated he had rebuilt four times, makes clear that the conduct charged in the instant case reflects a larger pattern of behavior.

Put simply, it is reasonable to infer from the sum of the Defendant's conduct and statements that the Defendant's offense conduct was neither aberrational, nor a momentary lapse in judgment.

Rather, it appears to part of a pattern of conduct the Defendant has consistently engaged in. Between February and June 2025, his conversations with SUBJECT 1 make clear he has continued to seek out CSAM content and to network with likeminded individuals on multiple occasions. Thus, his lack of significant criminal history and any other mitigating circumstances are eclipsed, or at the very least offset, by the Defendant's criminal conduct and his other characteristics.

### D. Danger to the Community

The nature and seriousness of the danger to any person or the community posed by the Defendant's release points squarely towards detention. That the Defendant poses a danger to the community is presumed by statute, *see* 18 U.S.C. § 3142(e)(3)(E), and should be factored into the Court's analysis, even if contrary evidence is presented. *See Ali*, 793 F. Supp. 2d at 388. And as discussed above, the dangers concomitant with the Defendant's conduct cannot be understated— the distribution of child pornography results in severe mental, emotional, and physical trauma to the children victimized by offenders, such as the Defendant, who seek sexual gratification through viewing and sharing of images depicting the sexual abuse of children. It is precisely "[t]hese significant harms and dangers [that] animated the Congress to create the statutory presumption of detention in these cases." *Galarza*, 2019 WL 2028710, at *7. This is particularly true where, as here, the Defendant is charged with having both received and distributed CSAM, is believed to have networked and engaged with likeminded "pedos" on multiple occasions, and to have shown a repeated motivation to acquire and collect CSAM content.

Release conditions cannot sufficiently mitigate this danger and prevent the Defendant from covertly reengaging in the offense conduct. Given "the uniquity of internet-capable devices[,]" the challenges in fashioning release conditions to mitigate the danger the Defendant's release presents are "insurmountable[.]" *See United States v. Dhavale*, 2020 WL 1935544, at *5 (D.D.C.

Apr. 21, 2020). This is particularly true in a case such as this, where it is clear the Defendant appears to have multiple connections to other like-minded individuals and to have been highly motivated to "improve" his methods to ensure the preservation and security of his porn collection. Similarly, the United States is skeptical that a third-party custodian can adequately monitor and enforce release conditions for 24 hours every day to prevent the Defendant from any internet access.

### IV.     Conclusion

For the foregoing reasons, the United States respectfully requests that the Court issue an Order granting its Motion that the Defendant be held without bond pending trial.

Respectfully submitted,
JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY


By: /s/ Andrea Duvall
ANDREA DUVALL
AR Bar Number 2013114
Assistant U.S. Attorney
United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
Telephone: (202) 252-2408
andrea.duvall@usdoj.gov