**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>**v.**<br>**CHRISTOPHER MURPHY**<br>**Defendant.** | **Case No. 25-cr-231 (RCL)** |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing in the above-referenced case. For the reasons set forth below, the government recommends a sentence of 156 months of incarceration, followed by 25 years of supervised release, to run concurrent to his sex offender registration requirement.

## FACTUAL AND PROCEDURAL BACKGROUND

On various occasions, Christopher Murphy (MURPHY or Defendant) used two encrypted messaging applications – Signal and Telegram – to distribute and to receive child sexual abuse material ("CSAM"). As further detailed below, in addition to his receipt and distribution of CSAM, the Defendant was a member of several Signal groups that were primarily used for the sharing of CSAM. MURPHY also hosted and attended Zoom video meetings, or "rooms," to connect with other "pedos" and view and exchange CSAM.

On January 25, 2025, using Signal, MURPHY asked an individual (USER 1), a resident of D.C., if there were "any perv groups rn." In response, USER 1 sent a link to a Zoom meeting. On January 29, 2025, again using Signal, MURPHY provided USER 1 with his Telegram handle. On February 2, 2025, USER 1 reached out to the Defendant on Telegram, providing his own Signal and Zoom usernames as a means of identification.

Using Telegram, MURPHY not only distributed CSAM but also engaged in multiple discussions between February 2025 and June 2025 with USER 1 regarding his collection of porn, "pedos," and joining Zoom "rooms." On February 27, 2025, for example, the Defendant asked USER 1 if he was "[u]p to any misbehaving?" After accepting an invitation to join a "room" USER 1 was hosting, the Defendant said his "usual" Zoom account had been deactivated after the last time he had hosted a "room" and later thanked USER 1 for hosting a "fun room." The next day, on February 28, 2025, the Defendant told USER 1 that he was in a "small room" with "just 4 pedos." Several hours later, the Defendant told USER 1 that he was "hosting" a room and that USER 1 should join. Similarly, on March 3, 2025, the Defendant asked USER 1 if he was at work and told him that he was again running a "room." When USER 1 asked for the Defendant's Zoom screen name and told him that he was trying to "remember everyone," MURPHY sent several sexually explicit photographs, as well as a photograph of his face. MURPHY set up and joined Zoom rooms with the explicit purpose of watching CSAM with other individuals, including with USER 1.

On March 4, 2025, the Defendant told USER 1 that he was "working on a porn collecting/organizing project" and asked USER 1 if he was "chatting or watching see-pee" (a reference to child pornography). After USER 1 replied "[b]oth," the Defendant asked if he could join and USER 1 sent a link to a Zoom meeting. In multiple subsequent conversations, the

Defendant again discussed joining and hosting Zoom groups, as well as issues with Zoom due to the "1132 nonsense." (Of note, Zoom error code 1132 is associated with a user's temporary ban for violating community standards.) Despite these violations, MURPHY persisted in hosting and attending Zoom rooms for the purpose of viewing CSAM.

On Telegram, between March 22-23, 2025, the Defendant sent several videos, including two depicting CSAM, to USER 1. Specifically, on March 22, 2025, the Defendant sent a video of an adult male licking the anus of what appears to be a prepubescent boy's nude and exposed anus and scrotum. On March 23, 2025, the Defendant sent another CSAM video, which was labeled, "DAD SLAM HIS 13 YEARS OLD SON," and showed what appears to be a pubescent boy being injected in the arm with an unknown substance followed by additional injections in the boy's anus before the boy's mouth and anus are penetrated by an adult male's erect penis. On April 12, 2025, the Defendant told USER 1 that despite "obsessively" trying to repair his hard drive, he ultimately lost all his "sCPecial" content. Using Telegram, the Defendant continued to engage in similar discussions with USER 1 until June 2025.

In addition to his distribution of CSAM on Telegram, MURPHY also distributed CSAM through Signal. Specifically, on June 7, 2025, the Defendant asked USER 1 if he had a specific "reaction" video. The Defendant then provided a graphic description of the video, saying that it included a "[h]ot pedo" and a "vid of Dylan and his two dads." After USER 1 indicated that he knew which video the Defendant was referencing but did not have it, the Defendant subsequently said that he was "rebuilding" his collection and discussed methods of storing his content, as seen in Figures A-B below:




*Figure A: June 7, 2025, Signal messages between the MURPHY and USER 1*




*Figure B: June 9, 2025, Signal messages between the Defendant and SUBJECT 1*

During this time frame, between June 8 and June 14, 2025, the Defendant used Signal both to distribute CSAM to USER 1, as well as to receive CSAM. Specifically, on June 8, 2025, shortly after the Defendant advised that he was rebuilding his collection, USER 1 sent fifteen videos of adult males recording themselves masturbating while watching videos on other devices of CSAM, including videos of an adult male penetrating the anus of an infant male. The Defendant acknowledged receipt by saying, "F[***], thank you!! My hero!"

On June 11, 2025, MURPHY sent USER 1 a CSAM video depicting an adult male's penis penetrating the anus of what appears to be a prepubescent boy, which ends with the adult male ejaculating inside of the boy's anus. On June 14, 2025, MURPHY sent USER 1 two additional CSAM videos, each comprised of numerous clips depicting adult males masturbating while watching CSAM, which included videos depicting adult males' erect penises penetrating the mouths and anuses of both infant and toddler age males.

In July 2025, after the arrest of USER 1 and recovery of his messages with the Defendant, the undercover law enforcement officer ("UC") contacted the Defendant using USER 1's Signal account, where the Defendant informed the UC that he lived in Phoenix. The UC also contacted the Defendant using a UC Telegram account, indicating that he found the Defendant through USER 1. After the UC told the Defendant that he was a "dad," the Defendant said, "[s]o you've got real experience…or at least a real shot at real experience…." The Defendant later said that he no longer shared files virtually due to the risk but did a "fair amount of screen sharing live" and talked about having had to rebuild his "special porn" collection four times.

MURPHY possessed thousands of videos and images of CSAM, including numerous videos of toddler and infant CSAM involving penetration and CSAM involving pre-pubescent children who are being penetrated by adults, and which involve bondage of pre-pubescent children.

On March 16, 2026, the Defendant plead guilty to one count of Distributing Child Pornography in violation of 18 USC §§ 2252(a)(2) and b(1).

## DISCUSSION AND RECOMMENDATION

### I. Generally Applicable Legal Principles

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 125 S. Ct. at 756.

In post-*Booker* cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing

disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

## II. 2021 Sentencing Commission Report

In 2012 and 2021, the U.S. Sentencing Commission published reports to Congress analyzing federal sentences in both production and non-production child pornography offenses. The reports call into question the applicability of several of the enhancements that apply in the instant matter including (1) use of a computer, (2) engaging in distribution, and (3) the number of images. These issues have been before Congress repeatedly, and Congress has declined to change the guidelines. Moreover, in the instant matter, each of these enhancements is and should be considered aggravating factors. Mr. Murphy not only used a computing device to distribute material online, but he specifically used Signal and Telegram, applications known to be heavily encrypted, to avoid law enforcement detection. He did not merely use these applications to view images, but instead to engage in an online community of individuals with whom he could share images of the rape and torture of young children, including toddlers. Thus, the enhancement for use of a computer should apply.

The enhancement for engaging in distribution is meant to distinguish offenders who merely possess or receive CSAM, conduct which is also covered under 2G2.2, from individuals who are actively assisting the further dissemination of these materials online. The instant matter is not a case involving a single instance of distribution of one image to a single person. Rather, Mr. Murphy engaged in distribution by sending dozens of images out to individuals who shared his interest in watching the rape and torture of children. This is an aggravating factor in this case, and the enhancement for engaging in distribution should apply.

Finally, Mr. Murphy acknowledged in the statement of offense that he possessed thousands of videos and images of CSAM, including numerous videos of toddler and infant CSAM involving penetration and CSAM involving pre-pubescent children who are being penetrated by adults, and which involve bondage of pre-pubescent children. The enhancement for the number of images is meant to distinguish individuals who have a handful of CSAM images in their possession from individuals who are prolific collectors, and therefore, pose a greater danger to children in society. Mr. Murphy falls into the latter category given the large number of images in his possession, and the enhancement for the number of images should apply.

Additionally, while the reports questioned certain enhancements in the current Guidelines, they also recommend three categories of aggravating factors that courts should consider when imposing sentences in non-production cases: content, community, and conduct. The Commission further explained how these factors should affect a defendant's sentence:

> The presence of aggravating factors from any of these three categories, even without the presence of any aggravating factors from the other two categories, warrants enhanced punishment depending on the degree that aggravating factors from that category are present in a particular case. The presence of aggravating factors from multiple categories generally would warrant a more severe penalty than the presence of aggravating factors from a single category.

U.S. Sent'g Comm'n, Report to Congress: Federal Child Pornography Offenses (2012) at 321 (hereinafter 2012 Report).

*Content*

As outlined in the 2012 Report, this factor directs courts to evaluate the content of an offender's collection and behavior "in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology." 2012 Report at 320.

*Community*

This factor directs the Court to evaluate "the degree of an offender's engagement with other offenders — in particular, in an Internet 'community' devoted to child pornography and child sexual exploitation." 2012 Report at 320. The Commission distinguishes between impersonal file-sharing exchanges, which involve "anonymous, indiscriminate" open exchange and no two-way communication, versus "personal" distribution in closed groups, involving two-way communication concerning child pornography and child exploitation. *Id.* at 313-14, 324.

*Conduct*

The third factor asks courts to assess whether an offender "has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense." 2012 Report at 320. Notably, the Commission recommends that, in addition to criminal offenses, courts consider "non-criminal acts of sexually deviant behavior" because such behavior also indicates sexual dangerousness. *Id.* at. 325.

As described in this sentencing memorandum, the aggravating factors articulated by the sentencing commission would be applicable in the instant matter. When evaluating Mr. Murphy's content, the statement of offense establishes that his volume is high ("thousands of videos and images of CSAM"), the sexual conduct is extreme ("including numerous videos of toddler and infant CSAM involving penetration and CSAM involving pre-pubescent children who are being penetrated by adults ,and which involve bondage of pre-pubescent children."), the age is extremely young, and Mr. Murphy actively discusses with others online his efforts to build and rebuild his collection of child pornography (*See* Figure B). As it relates to community, Mr. Murphy engages on both an individual and group level. Mr. Murphy has one-on-one discussions with people across encrypted applications like Signal and Telegram and actively acknowledges joining and hosting

Zoom rooms with other "pedos" to engage in the sharing and watching of child sexual abuse materials. Mr. Murphy sought out other like-minded individuals to build a community. Finally, as to conduct, the defendant's relentless effort to recover and grow his collection of CSAM as well as his efforts to seek out and engage with other like-minded individuals show that his conduct is not limited to a one-time lapse in judgement, but rather represent a sustained engagement in the trafficking of child pornography.

Even if the Court is inclined to not apply enhancements as outlined by the sentencing manual to Mr. Murphy's case and instead apply these three aggravators to Mr. Murphy's conduct, the application of these factors should result in the defendant receiving a guideline-compliant sentence.[1]

## II. Sentencing Guidelines Calculation

The government agrees with the Guidelines calculation set forth in the Presentence Report, estimating a final offense level of 34 and a Guidelines range of 151 to 188 months of incarceration.

## IV. Government's Sentencing Recommendation

The government recommends a guidelines compliant sentence of 156 months of incarceration, to be followed by 25 years of supervised release, to run concurrent with the sex offense registration period. This sentence aligns with the sentencing factors outlined in 18 U.S.C. § 3553(a) and is sufficient, but not greater than necessary, to reflect the seriousness of the offense, to promote respect for the law, as well as to ensure a balance of justice to all individuals involved, and to provide the defendant with necessary rehabilitation measures.

[1] The government believes that the sentencing factors do apply and should be applied. However, the government provides an alternative argument in an abundance of caution due to differing views among judges about which enhancements should apply in child pornography trafficking cases.

## V. The § 3553(a) Factors Support a Sentence of 156 Months of Incarceration.

### A. Nature and Circumstances of the Offense

The Defendant's conduct is extremely serious. The Defendant pled guilty to distribution of child sexual abuse material ("CSAM"). Unlike a defendant whose conduct is limited to passive possession, the Defendant's trafficking in CSAM was extensive and sustained, and was carried out across multiple encrypted platforms.

Using Signal and Telegram, the Defendant solicited and exchanged CSAM with numerous individuals, including a Washington, D.C. resident identified as User 1 and an undercover law enforcement officer (the "UC"). The Defendant distributed multiple videos containing CSAM to User 1 alone, including a video depicting an adult male's penis penetrating the anus of a prepubescent boy, and a video referencing a thirteen-year-old boy that depicted the sexual abuse and penetration of a pubescent child following injections administered by an adult male. The Defendant also received CSAM from User 1, including fifteen videos of adult males masturbating to CSAM, among them footage of an adult male penetrating the anus of an infant.

The scope of the Defendant's collection is extensive – including thousands of videos and images. That collection included numerous videos depicting the sexual abuse of toddlers and infants, including penetration, as well as content depicting the bondage and penetration of prepubescent children.

The Defendant's conduct extended well beyond one-to-one distribution. He was a member of Signal groups organized for the dissemination of CSAM, and he both hosted and attended Zoom video "rooms" for the express purpose of viewing and exchanging CSAM with other self-described "pedos."

The Defendant's offense also reflects active maintenance and cultivation of a CSAM collection. He told User 1 that he was working on a "porn collecting/organizing project," and later that he was "rebuilding" his collection and discussed methods for storing the material after his hard drive failed and he lost what he called his "sCPecial" content. When speaking with the UC in July 2025, the Defendant indicated that he had rebuilt his "special porn" collection on four separate occasions, demonstrating a persistent effort to maintain access to CSAM. His trafficking in CSAM preceding his arrest was extensive, organized, and community-oriented. He proactively asked whether there were "perv groups," provided his Telegram handle to facilitate further CSAM exchange, and discussed his interests with multiple users. When contacted by the UC posing as a parent, the Defendant did not discuss CSAM only in the abstract; he expressed direct interest in the UC's purported child, told the UC that he had "real experience . . . or at least a real shot at real experience," and described having engaged in "a fair amount of screen sharing live" because he no longer trusted virtual file-sharing due to "the risk."

This is not a defendant who stumbled upon CSAM or who made a one-time error in judgment. The Defendant's statements and actions reflect a sustained pattern of seeking out CSAM, cultivating relationships with similarly-minded individuals, organizing his collection, and distributing CSAM to others — conduct that, if not for his interactions with the UC leading to his arrest, would likely have continued and escalated.

The real-world consequences of this conduct are severe. First, it perpetuates an immense psychological toll on the child depicted in the video. Each video and image the Defendant possessed, received, and distributed depicts the sexual abuse of an actual child, and every act of redistribution and engagement inflicts a renewed violation on that child, whose abuse is preserved and recirculated indefinitely for the gratification of others.

Second, possession, solicitation, and distribution of CSAM perpetuate a market and demand for CSAM to be produced. Mr. Murphy's actions directly contributed to the sexual abuse and production of that sexual abuse of new victims.

The nature and circumstances of Mr. Murphy's crimes support a sentence of 156 months of incarceration followed by 25 years of supervised release as both justified and necessary.

**B. History and Characteristics of the Defendant**

Mr. Murphy accepted responsibility in this case, which shows some willingness to acknowledge his own wrongdoing and at least some degree of insight into his actions. [redacted] Additionally, Mr. Murphy has no prior criminal history.

[redacted]

While Mr. Murphy provides some context for the circumstances preceding and his mental state over the last several years during his offense period, that does not excuse it. The Defendant's own conduct during the offense period reflects more than the passive consumption of illegal material consistent with addiction; it reflects active engagement with a community of like-minded offenders. Mr. Murphy continuously and proactively reached out to User 1 over a period of months to request CSAM, discuss Zoom "rooms," and exchange material. Additionally, another user described the Defendant as a "tour guide for all things perv," a characterization evidenced by his own conduct in which he proactively steered the UC towards groups and rooms where CSAM was exchanged and readily offering guidance on storage methods and how to rebuild a collection.

Through his chats, Defendant showed an interest in "real world experience" with children — a pattern corroborated by the Defendant's own statement to the UC that, upon learning the UC

purportedly had a daughter, the UC had "real experience . . . or at least a real shot at real experience." Furthermore, the Defendant was "obsessively" trying to repair his hard drive and rebuild his collection, indicating a continuous pattern of abuse. Thus, this is not the conduct of an isolated, passive offender; it is the conduct of someone actively building and participating in a network organized around the sexual exploitation of children.

[redacted] The Defendant's actions and statements nonetheless support a sustained pattern of engagement with CSAM that would have likely continued, and may well have escalated, but for his interactions the UC leading to his arrest.

Mr. Murphy's characteristics, particularly his acceptance of responsibility and his initial efforts reflecting on the harm caused through his actions are important. But those characteristics do not – and should not – justify or erase his actions nor do they mitigate the life-long harm his actions perpetuate on the children sexually abused in those videos and images.

The government is requesting a guideline compliant sentence of 156 months, which is near the bottom of the guidelines in a case where the conduct would otherwise justify an upper-guidelines sentence. A bottom-of-the-guidelines sentence reflects the serious nature of the offense while also acknowledging Mr. Murphy's post-arrest actions.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense**

The government's recommended sentence in this case would promote respect for the law and provide just punishment for Mr. Murphy's offenses. 18 U.S.C. § 3553(a)(2)(A). As the Eleventh Circuit explained in *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010):

> This purpose--essentially the "just des[s]erts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.

Child pornography offenses are extremely serious because they result in perpetual harm to the most vulnerable victims, while simultaneously validating and normalizing the sexual exploitation of children. Courts across the country have recognized this:

> Child pornography is a vile, heinous crime …. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of the defendants, sorry that their actions were discovered by law enforcement.

*United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012).[2]

---

[2] *See also In re Amy Unknown*, 636 F.3d 190, 201 n.12 (5th Cir. 2011) (*citing United States v. Norris*, 159 F.3d 926 (5th Cir. 1998) (describing how the distribution of child pornography creates a marketplace for images of children, perpetuating abuse); *United States v. Yuknavich*, 419 F.3d 1302, 1310 (11th Cir. 2005); *United States v. Grosenheider*, 200 F.3d 321, 332-34 (5th Cir. 2000).

When enacting mandatory minimum penalties for those who produce and traffic in the sexual abuse and exploitation of children, Congress similarly described the grave harm caused by trafficking in child pornography:

> [W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . . [The] existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children . . . it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, § 121, 110 Stat. 3009, 3009-27 (1996).

The gravity of distributing child sexual abuse material cannot be overstated. As the Supreme Court recognized in *New York v. Ferber*, 458 U.S. 747, 759 (1982), "the distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children in at least two ways. First, the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. Second, the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled."

Traffickers of child pornography, like the defendant, create a market and demand for materials depicting the sexual abuse and exploitation of real children. They contribute to the cycle of abuse and are in part responsible for the harm suffered by the children used to produce the materials in their collections. *See United States v. Goff,* 501 F.3d 250, 259-260 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others

who support suppliers of child pornography"). In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims. Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].

491 F.3d 668, 672 (7th Cir. 2007). In other words, even if consumers of child pornography do not themselves molest children, their actions directly contribute to the abuse of children. Significant incarceration is necessary to promote respect for the law, ensure just punishment, and to reflect the seriousness of the defendant's offenses.

The government's proposed sentence would provide just punishment for these offenses, promote respect for child sexual abuse and exploitation laws, and reflect the seriousness of the defendant's offense and offenses against minor victims in general.

The Defendant was a participant in and contributor to that market. He actively sought out communities of like-minded offenders, distributed CSAM across multiple encrypted platforms, and hosted and attended live Zoom sessions for the viewing and exchange of abuse material — each act of distribution adding to the volume of content in circulation and extending the reach of the abuse depicted in every file he shared.

The U.S. Sentencing Commission has recognized that these offenses inflict what it described as "substantial and indelible harm" on the children who are victimized. United States Sentencing Commission, *Report to the Congress: Federal Child Pornography Offenses* (Dec. 2012). That harm is not limited to the moment of production. Research consistently shows that

victims suffer ongoing psychological injury each time their images are redistributed and viewed. This is harm that endures into adulthood and victims describe it as a form of perpetual re-victimization. As the Chair of the Victims Advisory Group to the United States Sentencing Commission stated, “the proliferation of child abuse images increases the risk of future victimization and harms the victims who are the subject of those images” because “repeated exposure to those images normalizes the sexual assault of children, promoting cognitive distortions.” *Id.*, App. D (statement of Chair, Victims Advisory Group).

The Defendant’s offense sits squarely within this framework of compounding harm. He was not a passive recipient of CSAM who stumbled upon illegal material. He was an active distributor and collector who fed the very network that *Ferber* identified as the engine of child exploitation. Every video and image the Defendant sent to an individual or shared in a Zoom “room” is a representation of a fresh circulation of that child’s permanent record of abuse — a new repeat violation that follows the victim long after the original abuse has ended. The Defendant distributed CSAM depicting the sexual penetration of infants, toddlers, and prepubescent children, content of the most severe kind, and did so repeatedly and deliberately over a period of months.

The government’s recommended sentence would reflect the true gravity of this conduct, promote respect for the laws enacted to protect children from this cycle of abuse, and ensure just punishment for an offense whose victims continue to suffer its consequences indefinitely.

**D. Adequate Deterrence and Protection of the Public**

CSAM trafficking offenses create a public safety risk for two reasons: 1) the overlap between individuals who engage in online trafficking of CSAM and individuals who engage in hands-on child sexual abuse and 2) the difficulty of detecting these crimes and monitoring compliance with conditions of release. Because of underreporting, it is difficult to obtain accurate

statistics regarding the number of individuals who have committed CSAM trafficking offenses and also committed hands-on abuse. A 2012 report released by the United States Sentencing Commission showed that approximately one in three non-production CSAM offenders had engaged in one or more types of criminal sexually dangerous behavior in addition to the charged CSAM offense. The Commission defined "criminal sexually dangerous behavior" as actual or attempted contact sex offenses, non-contact sex offenses, and prior non-production child pornography offenses. U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses, 314-315 (2012); https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf.

One significant study on this topic conducted by M.C. Seto, et al. conducted two meta-analyses to estimate the extent of hands-on sexual offending among individuals who sexually offended online. The study looked at 4464 men who committed online sexual offenses which were mostly CSAM trafficking. The findings of the study revealed that 12% of the 4464 men had a history of hands-on offenses based strictly on official records including arrests and convictions. However, the study also interviewed a sub-sample of 523 men involved in CSAM trafficking offenses. One in two men within that subgroup, a total of 55%, admitted to perpetrating offline contact sexual offenses against minors. M.C. Seto, R.K. Hanson & K.M. Babchishin, *Contact Sexual Offending by Men with Online Sexual Offenses*, 23.1 Sexual Abuse: A Journal of Research and Treatment 124-45 (2011).

Another study conducted by Matthew DeLisi studied 216 federal offenders who were on supervised release between 2016 and 2020. Of the 216 group members, 109 had previously been charged with a sexual contact offense and 107 had been charged with non-contact CSAM offenses

and had no prior arrests for contact offenses. 59% of the individuals convicted of CSAM offenses admitted to a prior contact sex offense for which they had never been charged. Dury A. J., Elbert M. J., & DeLisi M., *The Dark Figure of Sexual Offending: A Replication and Extension*, 38.6 Behavioral Sciences & the Law 559-570 (2020).

This data is consistent with cases in this district where defendants who engage in CSAM trafficking offenses also engage in hands-on abuse. *United States v. Allen Love*, 07-cr-27 (RBW) (in 2007, the defendant was sentenced for transportation of child pornography for distributing CSAM to an undercover agent and subsequently violated supervised release in 2024 for contacting minors to meet them for sex); *United States v. Charles Hilton*, 24-cr-554 (ACR) (defendant, who was previously convicted of endangering the welfare of a child, was sentenced in 2025 for uploading CSAM of a minor child he abused in addition to large quantities of CSAM he found on the internet); *United States v. Linwood Barnhill*, 25-cr-149 (JMC) (defendant, who was previously convicted of possession of child pornography and pandering, was sentenced in 2026 for sex trafficking minors). Because of the link between CSAM offenders and offenders who engage in hands-on abuse, there is a serious risk of danger posed by CSAM offenders to children in the real world.

Moreover, there have been cases in this District which demonstrate the difficulty in detecting these offenses. In *United States v. Bayo Bakare*, 23-cr-385 (TNM), the defendant was on supervised release following a conviction for Distribution of Child Pornography. The United States Marshal Service conducted a compliance check at Bakare's residence and recovered a phone that he was not authorized to have. The phone contained multiple images of child pornography. But for the compliance check conducted by law enforcement agents, Bakare's conduct would have gone undetected.

A significant sentence is necessary to achieve adequate deterrence, both specific and general. 18 U.S.C. § 3553(a)(2)(B). With respect to specific deterrence, Mr. Murphy's sustained conduct demonstrates a persistent and resourceful engagement with CSAM that was not easily interrupted even by repeated platform bans, hard drive failures, and the loss of his collection. He rebuilt that collection four times and moved between platforms when one was closed to him. The consistency and adaptability of Mr. Murphy's conduct make it plain that a meaningful term of incarceration is necessary to specifically deter him from reoffending upon release.

The Supreme Court has long recognized that penalizing those who distribute child pornography reduces the demand that sustains its production, and that reducing demand is one of the most effective tools for reducing the number of children subjected to abuse. *Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990). Thus, a sentence that does not meaningfully punish organized, community-based distribution of CSAM signals to the many participants in that market that such conduct carries acceptable risks, encouraging others to engage in or continue similar behavior. General deterrence is particularly important in CSAM cases, where conduct can go undetected for long periods of time, particularly with sophisticated actors like Mr. Murphy, who used encrypted tools to hide their illegal actions.

The defendant's conduct, as egregious as it was, went undetected before law enforcement happened upon another individual who happened to be connected to Mr. Murphy. Given the extent of his CSAM collection which included videos depicting the rape of particularly young children, toddlers, and infants, it is particularly important to sentence the defendant to a significant prison sentence to deter his and other would-be offenders' future criminal conduct.

A sentence of 156 months is necessary and appropriate to deter both this Defendant and others who engage in, or contemplate engaging in, the organized trafficking of CSAM.

**E. Kinds of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities**

Section 3553(a)(6) requires courts to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). However, it "does not require the district court to avoid sentencing disparities . . . between [] defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010)).

Here, the U.S. Sentencing Commission's Judicial Sentencing Information shows that the average sentence length for individuals sentenced under U.S.S.G. § 2G2.2 with a final offense level of 34 and Criminal History Category I was 110 months during Fiscal Years 2021–2025. The median sentence length was 98 months.

U.S.S.G. § 2G2.2 covers a wide range of behavior, including possession, receipt, transportation, and distribution of child pornography, among other conduct. The Defendant pled guilty to distribution of CSAM, and his actions were not those of a passive participant or mere bystander. The Defendant actively engaged in the solicitation of specific CSAM from various individuals, participated in at least one group disseminating CSAM, sought out a community of other individuals who engaged in the trafficking of CSAM, and perpetuated the cycle of abuse of these children by affirmatively distributing and disseminating CSAM to others. The Defendant's actions place him as one of the more serious actors in the wide range of behavior contemplated by U.S.S.G. § 2G2.2.

A sentence of 156 months appropriately accounts for the organized, multi-platform, and community-oriented nature of the Defendant's distribution conduct while avoiding unwarranted disparity with similarly situated defendants.

**F. Restitution**

In child pornography cases, restitution is mandatory to any person "harmed as a result of" a defendant's crime. See 18 U.S.C. § 2259(a), (c); see also *United States v. Monzel*, 930 F.3d 470, 476 (D.C. Cir. 2019); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) ("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child pornography, are entitled to mandatory restitution."). Restitution includes "the full amount of the victim's losses," which may include any costs incurred by the victim for:

> (A) Medical services relating to physical, psychiatric, or psychological care;
> (B) Physical and occupational therapy or rehabilitation;
> (C) Necessary transportation, temporary housing, and childcare expenses;
> (D) Lost income;
> (E) Attorneys' fees, as well as other costs incurred; and
> (F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(a), (b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015).

Distribution of Child Pornography is a child pornography trafficking offense, as defined in 18 U.S.C. § 2259(c)(3). Therefore, the Court shall determine the full amount of the victim's losses and shall order restitution in an amount that reflects the Defendant's relative role in the causal process that underlies the victim's losses, but which is not less than $3,000. 18 U.S.C. § 2259(b)(2).

In *Paroline v. United States*, 134 S. Ct. 1740 (2014), the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." *Paroline*, 134 S. Ct. at 1716. In *Paroline*, the defendant possessed two images of the victim who was seeking restitution. The Court's answer to this question involved three steps.

First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's offense proximately caused a victim's losses." *Id*. at 1722.

Second, the Court held that "proximate cause" under § 2259 did not require strict but-for causation. *Id*. at 1726-27. The Court recognized that in most child pornography possession cases, a victim's losses resulted from harm caused by the trafficking of his or her images by numerous "geographically and temporally distant offenders acting independently, and with whom the defendant had no contact." *Id.* at 1727. As a result, the Court held that:

> In this special context, where it can be shown that a defendant possessed a victim's images and that a victim had outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id*. at 1725. The Court made clear that, where the victim's losses are "the product of the acts of thousands of offenders," a restitution order should not be "too severe" but must not be merely "a token or nominal amount." *Id.* That is, in part, because a restitution order under § 2259 serves "twin goals," the first being to "help[] the victim achieve eventual restitution for all her child-pornography losses" and second to "impress[] upon offenders the fact that child pornography crimes, even simple possession, affect real victims." *Id.*

Third, the Court provided sentencing courts with the guidance regarding how to determine the proper amount of restitution under this standard. The Court noted that a sentencing court's goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses," taking into account any "available evidence." *Id*. at 1727-28. The Court emphasized that there is no "precise mathematical inquiry" governing

this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id.* at 1728. The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the defendant's relative causal role." *Id.* "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id.* Congress has since amended Section 2259 to both codify *Paroline*'s basic approach and to set a restitution floor of $3,000. *See* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (2018).

The Government will submit a separate filing including restitution requests on behalf of any known victims who have requested restitution in this matter.

## CONCLUSION

For the foregoing reasons, the government respectfully recommends that the defendant be sentenced to a term of incarceration of 156 months, followed by 25 years of supervised release.[3] Such a sentence contemplates not only the relevant guidelines range set forth for this offense, but also adequately reflects the factors as outlined in 18 U.S.C. § 3553(a).

[3] As part of the sentence, the government is also that the defendant be ordered to register as a sex offender, consistent with the requirements under the law, which includes a requirement to register for 25 years pursuant to the Sex Offender Registration and Notification Act, 18 U.S.C. § 2250, 34 U.S.C. §§ 20911(3).

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Richard Kelley*
Richard S. Kelley
DC Bar No. 1026390
Assistant United States Attorney
601 D St NW
Washington, DC 20530
(202) 834-3571
richard.kelley2@usdoj.gov